UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SPENCER NOWINSKI,

        Plaintiff,

    -v-                                6:14-CV-06559 (MAT)
                                          **DECISION AND ORDER**

M.D. RAO, R.H.S. ADMINISTRATOR
EILEEN DINISIO, M.D. KOOI, MTHULISI
NYONI, R.N. D. GRAFT, M.D. CARL
KOENIGSMANN, and M.D. DOLAN,

        Defendants.

## I. Introduction

*Pro se* plaintiff Spencer Nowinski("Plaintiff"), a prisoner currently incarcerated at the Five Points Correctional Facility ("Five Points"), commenced the instant action on September 24, 2014, alleging a violation of his Eight Amendment rights pursuant to 42 U.S.C. § 1983 ("§ 1983"). Currently pending before the Court is a motion for summary judgment (Docket No. 50) filed by defendants M.D. Rao ("Dr. Rao"), R.H.S. Administrator Eileen Dinisio ("Administrator Dinisio"), M.D. Kooi ("Dr. Kooi"), Mthulisi Nyoni ("PT Nyoni"), R.N. D. Graft ("PA Graf"[1]), M.D. Carl J. Koenigsmann ("Dr. Koenigsmann"), and M.D. Dolan ("Dr. Dolan") (collectively "Defendants"). For the reasons discussed below, the

---

[1] The record reflects that the individual referred to by Plaintiff as "R.N. D. Graft" is actually physician's assistant ("PA") Deborah Graf. The Court has accordingly referred to her PA Graf.

Court grants the pending summary judgment motion and orders that the case be closed.

## II. Factual Background

The following facts are taken from the statement of facts, declarations, and exhibits submitted by Defendants, as well as the docket in this matter. Plaintiff did not submit any papers in opposition to Defendants' motion, despite having been specifically warned of the repercussions of failing to do so. Accordingly, this Court has accepted Defendants' Rule 56 Statement of Undisputed Facts (which was submitted in accordance with the Local Rules of Civil Procedure) as undisputed "to the extent that [the facts set forth therein] are supported by admissible evidence and are not controverted by the record." *Brooks v. Piecuch*, 245 F. Supp. 3d 431, 434 (W.D.N.Y. 2017).

Plaintiff's complaint alleges that, sometime in 2002, he tore his anterior cruciate ligament ("ACL"). In February 2002, Plaintiff was arrested and jailed in the Cattaraugus County Jail, where he complained about his knee injury. Over the next nine years of incarceration, Plaintiff alleges that he was given various forms of treatment, including knee surgery in 2003 and multiple prescriptions for pain medication. Nevertheless, Plaintiff contends, his knee pain continued to increase over time.

In 2011 and 2012, Plaintiff was housed at the Attica Correctional Facility ("Attica"). During this time, because of

2

Plaintiff's ongoing complaints and his history of knee pain, it was recommended that Plaintiff under a total knee replacement. Dr. Rao, who is now retired but was at that time employed by the New York State Department of Corrections and Community Supervision ("DOCCS") and assigned to Attica, reviewed this recommendation, which was ultimately approved by DOCCS officials in Albany.

On October 26, 2011, Plaintiff underwent a total knee replacement of his right knee. Tissues and bone fragments taken during the surgery indicated that the condition of his right knee was consistent with arthritis. Plaintiff stayed in the hospital until October 31, 2011, whereafter he was returned to Attica. To help with post-surgery pain, Plaintiff was prescribed Tylenol with codeine.

Plaintiff was discharged to his cell in good condition on November 1, 2011. Dr. Rao saw Plaintiff on November 14, 2011. Plaintiff indicated he was in pain, so Dr. Rao renewed his pain medication for an additional five days. Plaintiff requested follow-up for his knee surgery, and Dr. Rao informed Plaintiff that he was waiting for a note from the physician who had performed the surgery. Beyond that, Dr. Rao indicated that he was not able to answer questions about the surgery because he was not an orthopedic surgeon. Plaintiff claims to have sent letters to Dr. Rao, but Dr. Rao does not recall receiving such letters. Dr. Rao noted in

3

the system that Plaintiff had requested to see a doctor to follow up on his surgery.

Registered Nurse Eileen Drankhan ("Nurse Drankhan"), who was employed by DOCCS at Attica, saw Plaintiff on November 28, 2011. She noted that Plaintiff was ambulating without difficulty and that he had returned his crutches. Plaintiff told Nurse Drankhan that he was able to walk "okay," but that he was not bending his right knee much. Nurse Drankhan encouraged Plaintiff to bend his knee and gave him 12 packs of ibuprofen. She also instructed him regarding simple exercises he could do to increase his knee's range of motion and minimize his pain.

Plaintiff was next seen by Attica medical staff on March 20, 2012, after he was involved in an altercation with another inmate. No complaints about his knee were noted at that time.

On July 1, 2012, Plaintiff sent a letter to Dr. Koenigsmann, DOCCS Chief Medical Officer, complaining about the medical department at Attica. Plaintiff's letter was referred to Administrator Dinisio, who was at time a regional health services administrator for DOCCS. Administrator Dinisio investigated Plaintiff's complaint and discovered that Plaintiff had recently been evaluated by his primary care provider, that he had been able to ambulate without difficult following his surgery, and that he had an appointment scheduled for July 30, 2012. Administrator Dinisio sent Plaintiff a letter setting forth those facts and

encouraging him to discuss his concerns with his primary care provider.

On July 30, 2012, Plaintiff was seen by Attica medical staff and complained that his knee was not bending well and was slightly swollen. Plaintiff was given Motrin and was put on callout for a physician to review.

PA Graf then saw Plaintiff on September 11, 2012. Plaintiff told PA Graf that he had not received physical therapy after his knee surgery, that he was not experiencing relief from nonsteroidal anti-inflammatory drugs ("NSAIDs"), and that he was unable to ambulate short distances or climb stairs. PA Graf noted that Plaintiff's right knee had limited flexion and that his gait was antalgic. She referred Plaintiff to physical therapy and prescribed him Voltaren, which is an anti-inflammatory medication, for his pain and swelling.

Dr. Rao reviewed PA Graf's referral for physical therapy, which was subsequently approved by DOCCS officials in Albany. An initial physical therapy session was scheduled for September 24, 2012. However, prior to that date, Plaintiff was transferred to the Auburn Correctional Facility ("Auburn").

On October 1, 2012, shortly after his transfer to Auburn, Plaintiff was seen on sick call. Plaintiff reported that he had swelling in his right knee and that he was waiting for physical therapy. Based on this report, Dr. Kooi, who was at that time the

5

Facility Health Services Director at Auburn, recommended that Plaintiff be scheduled for physical therapy, and an initial physical therapy appointment was scheduled for October 18, 2012.

PT Nyoni, a licensed physical therapist, saw Plaintiff on October 18, 2012. PT Nyoni would eventually see Plaintiff for physical therapy for his knee 16 times in 2012 and 2013, with Plaintiff failing to report for his physical therapy appointments on five occasions. The goals of this physical therapy were for Plaintiff to decrease his pain, improve his gait, increase his range of motion, and increase the strength in his legs. PT Nyoni employed a variety of techniques in treating Plaintiff, including the use of moist heat, range of motion exercises, and manipulation of Plaintiff's knee.

Dr. Dolan, who was a DOCCS physician assigned to Auburn during the relevant time period, first saw Plaintiff on November 19, 2012. Plaintiff complained of right knee pain and a poor range of motion following his surgery. Dr. Dolan saw Plaintiff again one week later. Dr. Dolan noted that Plaintiff had started physical therapy on October 18, 2012, and that he had had four physical therapy sessions scheduled with two no-shows. Dr. Dolan further noted that Plaintiff's right knee had poor strength and a poor range of motion and that there signs of atrophy in his right leg. Based on Plaintiff's complaints of pain, Dr. Dolan ordered an x-ray to see whether Plaintiff's knee appliance might be loose. Dr. Dolan noted

6

that Plaintiff should see him again after the x-ray was performed. An x-ray of Plaintiff's knee was taken on November 30, 2012, and showed that his knee prosthesis was in place without subsidence or loosening.

Dr. Dolan saw Plaintiff again on March 20, 2013. Plaintiff noted that Plaintiff's physical therapy had been somewhat irregular since his surgery and that he had a limited range of motion and pain in his right knee. Dr. Dolan suspected that there might be adhesions in Plaintiff's knee that were affecting his range of motion. Dr. Dolan recommended further physical therapy for Plaintiff, which was approved by DOCCS officials in Albany. Dr. Dolan further noted that it might ultimately be necessary for an orthopedic surgeon to manipulate Plaintiff's knee under anesthesia to address possible adhesions. Dr. Dolan ordered additional x-rays and blood tests of Plaintiff, and prescribed acetaminophen for his pain. Dr. Dolan did not refuse to refer Plaintiff to a specialist, but instead felt that physical therapy should be tried first, to see if Plaintiff's range of motion could be improved.

Three months later, in June 2013, PT Nyoni recommended that Plaintiff see a physician because he was showing minimal improvement in his range of motion through physical therapy. Dr. Kooi saw Plaintiff on June 27, 2013. Dr. Kooi noted that Plaintiff could walk but occasionally had a limp. Based on PT

7

Nyoni's notes and recommendation and his own evaluation of Plaintiff, Dr. Kooi then referred Plaintiff for a consultation with an orthopedic surgeon, and the referral was approved by DOCCS officials in Albany. Dr, Kooi also prescribed Plaintiff Naprosyn for his pain.

Dr. Kooi saw Plaintiff again on July 12, 2013. Dr. Kooi discontinued the Naprosyn and prescribed Neurontin for pain. He further advised Plaintiff to be active to help with his numbness and range of motion. On August 23, 2013, Dr. Kooi saw Plaintiff and increased his Neurontin dosage from 300 mg to 600 mg.

Plaintiff was seen by orthopedic surgeon Dr. Eldridge Anderson ("Dr. Anderson") on September 10, 2013. Dr. Anderson indicated that Plaintiff should continue with physical therapy and that a consultation with a revision specialist might be appropriate.

Dr. Kooi saw Plaintiff on September 12, 2013. He discussed Dr. Anderson's findings and recommendations with Plaintiff. Plaintiff indicated that he did not believe further physical therapy would be helpful.

On January 17, 2014, Plaintiff was seen by orthopedic surgeon Dr. Mitchell Rubinovich ("Dr. Rubinovich") to discuss possible revision surgery. That same day, Dr. Rubinovich sent a letter to Dr. Daniel Weinstock ("Dr. Weinstock"), a DOCCS physician at Auburn, in which he recommended that Plaintiff be provided a cane. Dr. Rubinovich also indicated that he wanted to further review

Plaintiff's imaging results and to discuss the matter with his medical partner. Dr. Rubinovich stated that he would contact Dr. Weinstock after he spoke with his partner.

Dr. Weinstock called Dr. Rubinovich's office on February 10, 2014, and was told that Dr. Rubinovich had been away for two weeks, but would be returning on February 17, 2014, and would call Dr. Weinstock back. Dr. Weinstock subsequently reported on March 3, 2014 that no revision surgery was possible at that time and that Plaintiff should be considered and evaluated for a cane.

Dr. Kooi saw Plaintiff on April 3, 2014. Dr. Kooi approved the recommendation that Plaintiff be given a cane and ordered a cane for Plaintiff. Plaintiff received his cane on April 8, 2014. Dr. Kooi subsequently approved Plaintiff's permit for a cane on at least three occasions.

Plaintiff was thereafter transferred to Five Points. He ultimately had knee revision surgery on November 17, 2016. Additional physical therapy was recommended by an orthopedic surgeon, but Plaintiff refused to attend. Plaintiff has been given a handicapped cell with shower access and has a permit to walk with a cane.

**III. Discussion**

    **A.   Legal Standard**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the moving

party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. *See Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *See Scott v. Harris*, 550 U.S. 372, 380 (2007), citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). A party opposing a motion for summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87).

**B. Failure to Exhaust Administrative Remedies**

As a threshold matter, Defendants contend that Plaintiff failed to exhaust his administrative remedies with respect to all of his claims related to events in 2011, 2012, "early 2013," and after August 20, 2013. The Court agrees.

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [§ 1983] . . . by a prisoner confined in any jail, prison, or other

10

correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). DOCCS "maintains a three-tiered administrative review and appeals system for prisoner grievances." *Torres v. Carry*, 672 F. Supp. 2d 338, 343 (S.D.N.Y. 2009). In particular, "[f]irst, an inmate may file an inmate grievance complaint form or a written grievance, if forms are not available, with the Inmate Grievance Resolution Committee ("IGRC"). Second, if the inmate is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. Finally, [DOCCS] permits an inmate to appeal the superintendent's written decision to the CORC [Central Office Review Committee]." *Id*. (internal citations omitted). An inmate must exhaust all three levels of review before he or she can bring a claim under § 1983. Moreover, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006).

In this case, DOCCS has submitted uncontroverted evidence that Plaintiff fully exhausted only one grievance related to his medical care following his knee surgery. That grievance was filed on August 20, 2013. The IGRC investigated and granted Plaintiff's grievance to the extent that it agreed his future health care needs should be tended to in a timely fashion. Plaintiff appealed to the superintendent, who agreed with the findings of the IGRC and noted

11

that Plaintiff had an upcoming appointment with an orthopedic surgeon. Plaintiff appealed to CORC, and on February 12, 2014, CORC issued a decision granting Plaintiff's request in part. In particular, CORC found that Plaintiff's complaints regarding his medical concerns in 2011, 2012, and "early 2013" were untimely. CORC further found that, with respect to the timely aspects of Plaintiff's grievance, there was no evidence to substantiate any claims of improper medical care or malfeasance by DOCCS staff. CORC encouraged Plaintiff to address his medical concerns via sick call.

CORC's conclusion that Plaintiff failed to timely grieve his complaints from 2011, 2012, and early 2013 is well-founded. Under DOCCS' system for inmate grievances, grievances must be filed "within 21 calendar days of an alleged occurrence." N.Y. Comp. Codes R. & Regs. § 701.5. In this case, Plaintiff did not file his grievance until August 20, 2013. Accordingly, his complaints related to any events occurring before July 30, 2013 were untimely. Plaintiff therefore failed to exhaust his administrative remedies with respect to such complaints.

Plaintiff also failed to exhaust his administrative remedies as to events occurring after August 20, 2013, the date of the only grievance he appealed to completion. Plaintiff never filed a grievance related to these later events, and under the PLRA, may not maintain a § 1983 claim based upon them. Moreover, there is no

12

evidence in the record from which the Court could conclude that Plaintiff was unable to comply with DOCCS' grievance procedures. To the contrary, the fact that Plaintiff filed and appealed to completion his August 20, 2013 grievance demonstrates that grievance procedures were available to him. Accordingly, to the extent Plaintiff's claims are based on events occurring before July 30, 2013 or after August 20, 2013, Defendants are entitled to judgment in their favor.

### C. Plaintiff Cannot Show a Violation of His Eight Amendment Rights

Plaintiff's claims are based on his Eight Amendment right to be free from cruel and unusual punishment. "The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). However, the Second Circuit has made it clear that "not every lapse in medical care is a constitutional wrong." *Id*. Instead, to demonstrate an Eighth Amendment violation, Plaintiff is required to meet two separate requirements. "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Id*. (internal quotation omitted). Determining whether a deprivation was objectively serious in turn involves two inquiries: "The first inquiry is whether the prisoner was actually deprived of adequate medical care. . . . Second, the objective test asks whether the inadequacy in medical care is

13

sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id*. at 279-80.

The second requirement to show an Eighth Amendment deprivation of medical care claim "is subjective: the charged official must act with a sufficiently culpable state of mind." *Id*. at 280. In particular, "[i]n medical-treatment cases not arising from emergency situations," the party claiming a constitutional violation must show that a defendant "acted with deliberate indifference to inmate health." *Id*.

In this case, even taking into account events before July 30, 2013 and after August 20, 2013, it is clear that no rational factfinder could hold that either of these requirements were met. Turning to the first requirement, there is simply no evidence that Plaintiff was deprived of adequate medical care. To the contrary, the record shows that Plaintiff was provided with extensive care for his knee problems, including multiple surgeries, physical therapy, medication, and accommodations such as a cane and a handicapped cell. *See Gray v. Kang Lee*, No. 9:13-CV-258 GLS/DEP, 2015 WL 1724573, at *3 (N.D.N.Y. Apr. 15, 2015) (prisoner could not satisfy objective requirement where he was "frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist").

14

With respect to the second, subjective requirement, once again there is no evidence from which a rational factfinder could hold in Plaintiff's favor. It is apparent that Defendants made reasonable efforts to provide Plaintiff with appropriate medical care. The medical staff at both Attica and Auburn took Plaintiff's knee complaints seriously, providing him with a wide variety of pain medications, referring him for physical therapy, and seeking the advice of outside orthopedic surgeons. Plaintiff's disagreement with his providers' medical judgment regarding the advisability of ongoing physical therapy is insufficient to demonstrate deliberate indifference to his medical needs. *See Green v. Khrisnaswamy*, 134 F. App'x 465, 466 (2d Cir. 2005). Nor is Plaintiff's belief that he should have been prescribed stronger pain medication evidence of a culpable state mind by Defendants. "While prisoners have a right to medical care, they do not have a right to chose a specific type of treatment. Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment." *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (internal citations omitted).

Based on the record, Plaintiff is unable to "demonstrate that any of the Defendants was aware of but consciously disregarded a substantial risk to his health." *Day v. Lantz*, 360 F. App'x 237, 239 (2d Cir. 2010). To the contrary, the record in this case shows

15

that Plaintiff's providers actively attempted to address Plaintiff's medical concerns. As such, summary judgment in favor of Defendants as to all of Plaintiff's claims is warranted.

**IV. Conclusion**

For the reasons set forth above, the Court grants Defendants' motion for summary judgment (Docket No. 50). The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *See Coppedge v. United States*, 369 U.S. 438 (1962). The Clerk of the Court is instructed to enter judgment in favor of Defendants and to close the case.

**ALL OF THE ABOVE IS SO ORDERED.**

S/Michael A. Telesca

HON. MICHAEL A. TELESCA
United States District Judge

Dated: May 21, 2018
Rochester, New York.